Filed 9/23/13  P. v. Vartanyan CA2/7

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>AVETIS VARTANYAN,<br><br>    Defendant and Appellant. | B240976<br><br>(Los Angeles County<br>Super. Ct. No. BA348894) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Sam Ohta, Judge.  Affirmed.

George Gevork Mgdesyan for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Senior Assistant Attorney General, Stephanie A. Miyoshi and Rama R. Maline, Deputy Attorneys General, for Plaintiff and Respondent.

_____

As part of a negotiated agreement, Avetis Vartanyan pleaded no contest to one count of voluntary manslaughter and admitted a firearm-use enhancement. Prior to sentencing, Vartanyan moved to withdraw his plea. The trial court denied the motion and imposed a 16-year state prison term pursuant to the plea agreement. On appeal, Vartanyan contends the court coerced him to enter a guilty plea. We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

1. *Preliminary Hearing Evidence*[1]

On the evening of May 20, 2008, a group of men were arguing in the parking lot of a shopping center. Shots were fired, killing Artak Karamyan and Paylak Harutyunyan. Vartanyan was seen running from the shopping center through a residential neighborhood. The police found Vartanyan in the backyard of a house and recovered the handgun used to kill Karamyan from the backyard of a nearby house.

2. *The Information*

On October 28, 2009, Vartanyan was charged by information with the murders of Karamyan and Harutyunyan (Pen. Code, § 187, subd. (a))[2] with special allegations he had personally and intentionally discharged a firearm causing great bodily injury or death in committing the murders (§ 12022.53, subd. (d)) and had personally and intentionally discharged a firearm in committing the murders (§ 12022.53, subd. (c)). It was also specially alleged Vartanyan had previously served two separate prison terms for felonies (§ 667.5, subd. (b)). Represented by retained counsel,[3] Vartanyan pleaded not guilty and denied the special allegations.

---

[1]    Because Vartanyan entered into a plea agreement midway through trial, we rely upon the preliminary hearing transcript to summarize the facts.

[2]    Statutory references are to the Penal Code.

[3]    Vartanyan is represented by the same counsel on appeal.

2

3. *Pretrial Motions*

The trial court heard and denied Vartanyan's motion to dismiss the information (§ 995) and granted the People's motion to dismiss the second count, the murder of Harutyunyan, in furtherance of justice.

4. *Vartanyan's No Contest Plea and Related Proceedings*

On August 6, 2010, during the People's case-in-chief and outside the presence of the jury, the trial court told Vartanyan it had discussed with both counsel the plea offer that had been made to him. The court engaged in a lengthy discussion with Vartanyan about the consequences of going to trial, comparing potential sentences if Vartanyan was convicted with the offer that had been made. The court explained to Vartanyan he would face consecutive terms of 25 years to life for first degree murder and personal use of a handgun, meaning he would not be eligible for parole for 50 years and would not likely be released on parole because "the facts of the case are so brazen, what happened is so bad, you know, daylight with people, innocent people potentially getting hurt," and Vartanyan purportedly was a gang member.

The court encouraged Vartanyan to evaluate the prosecutor's offer objectively and told Vartanyan the offer of a 10 to 20-year sentence was objectively reasonable from the prosecutor's perspective, adding the prosecutor "was not playing hardball in terms of settlement." The court continued, "again from your perspective you may think it's not reasonable. ['] I didn't do it, I don't want to take the deal.['] That's fine. If that is where you're at, then roll with it. Okay?"

The trial court then told Vartanyan, "So the bottom line is, if you wanted to resolve this case, it's not going to make you happy. It's not going to be something you're going to be, you know, yelling 'yippee' about. You're going to be unhappy about it. You're going to say, 'Dang, that's a lot of time.' You have to understand that, if you don't take the deal and you get convicted, which is a possibility, that you're going to be really upset to the degree where you're going to think, 'Man, my life is over.'"

3

The trial court informed Vartanyan, if convicted, he would be sentenced for first or second degree murder according to the law to a term of 15 years to life, or 25 years to life, 35 years to life or 50 years to life. A determinate term sentence would not be possible if Vartanyan were found guilty. The court inquired whether Vartanyan understood these sentencing options, and Vartanyan answered he did. The court then asked if he had any questions, and Vartanyan replied he knew the consequences. The court then recessed the trial, during which Vartanyan spoke with his family and defense counsel.

When trial reconvened, the parties informed the trial court they had reached a plea agreement that provided Vartanyan would plead no contest to an amended count of voluntary manslaughter (§ 192, subd. (a)) for a six-year sentence and admit personal use of a firearm (§ 12022.5, subd. (a)) for a 10-year sentence. In return, the murder count and remaining firearm-use and prior prison term enhancement allegations would be dismissed.

The record of the plea hearing established Vartanyan was advised of and waived his constitutional rights, was advised of and acknowledged he understood the consequences of his plea and indicated no one had made any promises or threats to make him enter a no contest plea. Defense counsel joined in the waivers, concurred in the plea and stipulated to a factual basis for the plea. The trial court found Vartanyan had knowingly, voluntarily and intelligently waived his constitutional rights and entered his no contest plea.

The trial court agreed to continue sentencing for 60 days, but advised Vartanyan if he subsequently wanted to withdraw his plea, his motion would require "legal cause." The court further stated, "I also want the record to reflect that we spent an hour and a half talking to the defendant. He had an opportunity to talk with his family." Because sentencing was continued to October 6, 2010, the court declared a mistrial on the murder count.

4

5. *Vartanyan's Motions to Withdraw His Plea*

On January 27, 2011, Vartanyan filed a motion to withdraw his plea (§1018), asserting that he had been unduly pressured by the trial court to enter a guilty plea.[4] The People opposed the motion, which the court denied. Vartanyan then filed a motion for reconsideration.

In his declaration in support of the motion, Vartanyan stated he had always wanted a trial, confident he would be acquitted of the murder charge. However, when the court unexpectedly spoke to him in the middle of trial "about the risks of a murder trial and he can see how I can end up doing a life sentence in this case, I was overwhelmed and frightened." Vartanyan stated, when the court "was telling me it was better to take the prosecutor's offer than serve life" and "I would be younger than he after I served my time[,] I was terrified, I felt like I lost my strength and the reasons I held onto for two years." Vartanyan stated he felt he no longer had any options because "the most important person in the courtroom, the judge, thought I was going to lose." Consequently, Vartanyan said he had concluded that if he did not agree to the negotiated plea, he would be in prison for the rest of his life.

6. *Sentencing Hearing*

On March 20, 2012, the same bench officer who had presided over the plea hearing presided over the sentencing hearing. In accordance with the plea agreement, the trial court sentenced Vartanyan to an aggregate state prison term of 16 years, consisting of the middle term of six years for voluntary manslaughter, plus ten years for the firearm-use enhancement. )~ The court ordered Vartanyan to pay a $40 court security fee, a $30 criminal conviction assessment and a $ 200 restitution fine. The court imposed and suspended a parole revocation fine pursuant to section 1202.45. Vartanyan was awarded a total of 1,610 days of presentence credit (1,400 actual days and 210 days of conduct credit). The remaining count and special allegations were dismissed on the People's motion.

---

[4]    The motion did not include a declaration by Vartanyan.

5

Vartanyan timely filed a notice of appeal, and the court granted his request for a certificate of probable cause.

## DISCUSSION

### 1. *Standard of Review*

Vartanyan appeals from the order denying his motion to withdraw his plea under section 1018. We review the denial of a motion to withdraw a plea for abuse of discretion. (*People v. Sandoval* (2006) 140 Cal.App.4th 111, 123, *People v. Wharton* (1991) 53 Cal.3d 522, 585.) However, because the trial court relied on facts which are not part of the record on appeal,[5] the People assert that Vartanyan has forfeited his claim by failing to provide an adequate record. We construe the appeal as challenging the voluntariness of his plea.

A plea, like any other waiver of constitutional rights, "may be accepted by the court only if knowing and intelligent☐made with a full awareness of the nature of the right being waived and the consequences of the waiver. In addition, the waiver must be voluntary." (*People v. Smith* (2003) 110 Cal.App.4th 492, 500; see also *New York v. Hill*

---

[5] "The court rules as follows: 1) Based on the disturbance caused by the information received from the remaining jurors that they leaned in favor o[f] acquittal, there exists a plausible explanation that the defendant changed his mind about the decision to enter a plea to resolve the case. The comments by the court to the defendant as well as the facts found by the court, as it relates to comments made to the defendant by the prosecutor, are distinguishable from [*People v.*] *Weaver* [(2004)118 Cal.App.4th 131] and were not of the nature such as to overcome the will of the defendant. This plausible explanation for the change of mind, added to the distinguishable nature of the court's comments leads the court to conclude the defendant has failed to show by a [sic] clear and convincing evidence that his free will was overcome at the time of entering the deal. ¶ (2) Assuming the defendant was not informed about the juror's comments, which appears to me not likely, the comments by the court, as well as the determined facts of what the prosecutor said to the defendant are alone distinguishable from *Weaver*, [*supra.*] and given the time to reflect and the opportunity to speak with both family and counsel about what if any course of action to take, leads me to conclude defendant has failed to show by clear and convincing evidence that his free will was overcome." The reporter's transcript of the hearings on the motion to withdraw the plea and the motion for reconsideration are not part of the appellate record.

(2000) 528 U.S. 110, 114 [145 L.Ed.2d 560, 120 S.Ct. 659].)  When a defendant elects to waive the fundamental constitutional rights that accompany a trial by pleading no contest or guilty "the record must reflect that the defendant did so knowingly and voluntarily- - that is, he or she was advised of and elected to refrain from exercising the fundamental rights in question."  (*People v. Collins* (2001) 26 Cal.4th 297, 308.)

Under the governing test, a plea is valid "if the record affirmatively shows that it is voluntary and intelligent under the totality of the circumstances."  (*People v. Howard* (1992) 1 Cal.4th 1132, 1175; see also *North Carolina v. Alford* (1970) 400 U.S. 25, 31 [27 L.Ed.2d 162, 91 S.Ct. 160].)  In contrast, "guilty pleas obtained through 'coercion, terror, inducements, subtle or blatant threats' are involuntary and violative of due process. [Citations]."  (*People v. Sandoval*, *supra*, 140 Cal.App.4th at p. 124.)  Thus, if a guilty plea is induced by promises or threats it is involuntary.  (*People v. Collins, supra*, 26 Cal.4th 297, 312.)  "However, involuntariness is found only if threats, duress, or coercion overcome the exercise of the defendant's 'free judgment.'"  (*People v. Sandoval, supra,* 140 Cal.App.4th at p. 123.)  We review the record independently to determine the voluntariness of the waiver of rights and entry of the plea.  (*People v. Mosby* (2004) 33 Cal.4th 353, 360-361.)

2.  *The Trial Court Did Not Coerce Vartanyan To Enter A Plea*

Although California law does not prohibit judicial involvement in plea negotiations, a judge's participation in plea discussions may improperly influence a defendant's decision to accept a plea agreement.  "[W]hen the trial court abandons its judicial role and thrusts itself to the center of the negotiation process and makes repeated comments that suggest a less than neutral attitude about the case or the defendant, then great pressure exists for the defendant to accede to the court's wishes."  (*People v. Weaver* (2004) 118 Cal.App.4th 131, 150 (*Weaver*).)  Nonetheless, not every instance of judicial involvement in plea negotiations results in duress.  (*Id.* at pp. 149-150.)  "Judges can, in appropriate cases and in a reserved manner, play a useful part in that process."  (*Weaver* at p. 150.)

Relying on *Weaver,* Vartanyan argues the trial court coerced him to accept the negotiated plea by advocating at length for the prosecution, causing him to believe he would not be afforded a fair trial.

In *Weaver,* the defendant pleaded guilty to multiple counts of child molestation. After repeated and prolonged efforts by the trial court to induce a plea, and after the trial court indicated it would admit potentially prejudicial evidence that, in the trial court's stated view, indicated the defendant would be convicted, and that the crimes were the result of a "particular and dangerous mental disorder" (pedophilia). (*Weaver* at p. 149.) The Court of Appeal reversed the denial of his motion to withdraw his plea based upon the coercive comments of the trial judge during plea negotiations. (*People v. Weaver*, *supra*, 118 Cal.4th at p. 136.)

Unlike the trial judge in *Weaver,* the trial judge in the present case did not express an opinion that Vartanyan was guilty, advocate on behalf of the victim or make derogatory comments about Vartanyan. Nonetheless, Vartanyan argues the pressure brought to bear on him was greater than that described in *Weaver* because the trial judge identified himself as a former prosecutor, commented on the evidence, suggesting it would lead the jury to view Vartanyan unsympathetically, and stated Vartanyan would be sentenced to the term prescribed by law if convicted and would not likely be granted parole.

After examining the totality of the circumstances, Vartanyan's proffered, coercive interpretation of the trial court's comments as advocating for the prosecution and pressuring him to accept a negotiated plea, does not fairly characterized the events, or indicate that the plea was not entered voluntarily and intelligently. (*People v. Mosby,* *supra,* (2004) 33 Cal.4th at pp. 360-361.)

The record suggests the trial court became involved in plea discussions only after Vartanyan indicated an interest in entering a plea in return for a seven-year sentence. The trial court explained to Vartanyan his potential prison exposure in matter-of-fact terms, comparing the maximum sentence he faced if he were convicted by a jury as opposed to the actual sentence being contemplated by the prosecutor as part of a negotiated plea.

Indeed, Vartanyan does not claim the trial court exaggerated when it told Vartanyan he could be sentenced to a term of 50 years to life under the law and would probably not be granted parole if he were found guilty. These comments must be interpreted in context as accurately advising Vartanyan of the realistic alternatives he had to assess in determining whether to proceed with the trial, given the fact the prosecutor was not offering Vartanyan a seven-year prison term as part of a negotiated plea. The trial court never urged Vartanyan to accept the plea offer or advised Vartanyan the negotiated plea was in his best interests. Rather, the trial court told Vartanyan if he decided to reject the prosecutor's offer, "If that's where you're at, then roll it. Okay?" Although the trial court could well have avoided commenting on the evidence and its effect on the jury, the court thereafter acknowledged to Vartanyan the outcome of the trial was uncertain, "So you don't have a slam dunk case either way." In sum, the trial court accurately explained, albeit at length, the possible consequences of a guilty verdict and pointed out the benefits that could naturally accrue from the entry of a plea. (See *People v. Ray* (1996) 13 Cal.4th 313, 339-341.)

The trial court then recessed the proceedings to allow Vartanyan to discuss the matter with his family and his attorney. When the parties returned to court, Vartanyan told the trial court he wanted to accept the prosecutor's offer of a negotiated plea. At the plea hearing, Vartanyan orally acknowledged he understood the nature and consequences of the plea and was entering his plea "freely and voluntarily" because he thought "it was in his best interests to do so. Vartanyan's defense counsel joined in the waivers and concurred in the plea. We presume counsel properly reviewed the terms of the plea agreement and advised Vartanyan of his rights, because Vartanyan is not claiming ineffective assistance of counsel, and there is no evidence that counsel neglected his duties. Thus, Vartanyan has failed to show that he entered his negotiated plea involuntarily, as the result of judicial coercion.

9

**DISPOSITION**

The judgment is affirmed.

ZELON, J.

We concur:

PERLUSS, P. J.

WOODS, J.